IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ADAM RICHARD SANBORN, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil Action No. 16-4408 (JBS) |
| COMMISSIONER OF SOCIAL SECURITY, | **OPINION** |
| Defendant. | |

APPEARANCES:

Michael Joseph Brown, Esq.
WOLF & BROWN, LLC
228 Kings Highway East
Haddonfield, NJ 08033
        Attorney for Plaintiff

Heather Anne Benderson, Special Assistant U.S. Attorney
Social Security Administration
300 Spring Garden Street
Philadelphia, PA 19123
        Attorney for Defendant

**SIMANDLE**, District Judge:

I.    **INTRODUCTION**

       This matter comes before this Court pursuant to 42 U.S.C. §
405(g) for review of the final decision of the Commissioner of
the Social Security Administration ("SSA") denying Plaintiff
Adam Sanborn's ("Plaintiff") application for disability benefits
under Title XVI of the Social Security Act, 42 U.S.C. § 401, <u>et
seq.</u> Plaintiff, who suffers from a gunshot wound to his right

shoulder, upper extremity radiculopathy as a result of his gunshot wound, tinnitus, post-traumatic stress disorder ("PTSD"), and major depressive disorder, was denied benefits for the period beginning on November 26, 2013, the alleged onset date of disability, to November 4, 2015, the date on which the Administrative Law Judge ("ALJ") issued a written decision.

In the pending appeal, Plaintiff argues that the ALJ erred by: (1) failing to provide substantial evidence in support of the ALJ's decision to assign little weight to the medical opinion of Plaintiff's treating physicians; (2) failing to provide substantial evidence to support the ALJ's decision to assign little weight to the fact that Plaintiff was found to be disabled by the Veteran's Administration ("VA"); (3)relying solely on the subjective statements of Plaintiff in arriving at the conclusion that Plaintiff's mental impairments do not meet and/or equal the Listings in 12.04 and 12.06; and (4)failing to comply with SSR 96-8 in assessing Plaintiff's Residual Functional Capacity. For the reasons that follow, and after careful review of the entire record, the parties' submissions, and the applicable law, this Court will remand the case for further adjudication consistent with this Opinion.

## II. BACKGROUND

### A. Procedural Background

Plaintiff filed his application for Social Security disability benefits on January 4, 2014, alleging an onset of disability from November 26, 2013, when he was age 29. (R. at 197.) His claim was denied by the Social Security Administration on April 24, 2014. (Id. at 21.) His claim was again denied upon reconsideration on August 18, 2014. (Id.) Plaintiff next testified in person in front of the ALJ on June 2, 2015. (Id.) The ALJ issued an opinion on November 4, 2015, denying benefits. (Id. at 39.) On May 18, 2016, the Appeals Council denied Plaintiff's request for review. (Id. at 1.) This appeal follows.

### B. Medical History

The following facts are relevant to the present motion. Plaintiff was born on December 13, 1984, and is currently thirty-two years old. (Id. at 54.) Plaintiff graduated from high school and then served in the United States Marine Corp from 2004 to 2007. (Id. at 61.) While serving in Iraq, Plaintiff suffered a gunshot wound to the right shoulder. (Id. at 55.) After being honorably discharged, Plaintiff worked at a grocery warehouse in 2008, and then as a corrections officer from 2018 to 2013. (Id. at 63, 206–07.) Plaintiff had to leave his work at the correctional facility when his anxiety and anger became too much. (Id. at 64.) Plaintiff testified that his anger would

cause him to have "real mood swings" while at work. (Id.) He also feared that the inmates would attack him. (Id. at 66.) One day at work, his anxiety became so strong that it led to a panic attack. (Id. at 64.) Another day, he got into an altercation with a prisoner and blacked out. (Id. at 65.) After the incident, he and his supervisor argued on how to "handle the incident." (Id.) This led to Plaintiff feeling tightness in his chest and "sort of hyperventilating", he radioed for help and passed out. (Id.) When he woke up he was taken to the emergency room. (Id.) While working from 2012 to 2013, Plaintiff completed a year of community college. (Id. at 59.) At his hearing before the ALJ, Plaintiff testified that he continued to take classes and had earned forty-eight credits. (Id. at 61.)

### 1. Treatment before Plaintiff's Disability Onset Date (November 21, 2007–August 31, 2013)

On November 21, 2007, Dr. Rago diagnosed Plaintiff with PTSD and assigned him a Global Assessment of Functioning ("GAF")[1] Score of 61–70. (Id. at 343.) Dr. Rago wrote in his objective findings that there was no evidence of any major concentration or memory disturbances, and he suspected Plaintiff would get better and his PTSD would resolve. (Id.)

---

[1] GAF is a numeric scale used by mental health professionals to rate the social, occupational, and psychological functioning of a patient. Scores range from 1 (severely impaired) to 100 (extremely high functioning).

4

Less than three months later, on March 3, 2008, Plaintiff was seen by Dr. Dale for a fifty-minute psychotherapy session. (Id. at 353.) During the session Dr. Dale noted that Plaintiff was experiencing anxiety, but was able to leave the house if he had a plan, was still maintaining relationships with friends, especially fellow Marines, and was not experiencing symptoms of depression. (Id.)

Eight months later, on November 30, 2009, Plaintiff was seen by Physician Assistant Knepp who noted Plaintiff had "new (interval) diagnosis" of worsening PTSD symptoms, insomnia, and sleepwalking. (Id. at 324.)

On March 4, 2010, Plaintiff was seen by Dr. Aksu who noted that Plaintiff stated he had been having more panic attacks in public so he was isolating himself. (Id. at 314.) Plaintiff also said he was experiencing restlessness, pacing, irritability, nightmares, and continued sleepwalking. (Id.) Plaintiff was diagnosed with alcohol dependence, PTSD, and was prescribed Abilify for his anger, irritability, and agitation. (Id. at 318.)

On July 15, 2013, Plaintiff was evaluated by Dr. Vangala. (Id. at 406.) Plaintiff's chief complaints were feelings of stress and anxiety, and that his PTSD symptoms were worsening. (Id. at 403.) The doctor conducted a mental status examination and noted that Plaintiff was dressed appropriately, alert, calm

and cooperative, well-oriented, had good personal hygiene, maintained eye contact well, had regular speech, was goal-oriented, and had a logical thought process and fair memory (Id.) Dr. Vangala diagnosed Plaintiff with PTSD, work and relocation stress, and a GAF score of 55. (Id. at 405.)

On August 31, 2013, Dr. Nwachukwa saw Plaintiff for a follow-up appointment. (Id. at 416.) The doctor noted that Plaintiff's PTSD screening test was positive. (Id. at 417.) Dr. Nwachuwka assessed that Plaintiff was acutely suicidal, but did not find him to have suicidal plans or a history of suicide attempts. (Id. at 415.) The doctor noted that Plaintiff already had a follow up appointment scheduled with his behavioral health provider, but reminded the patient of a 24 hours emergency service number. (Id.)

> ### 2. Medical Treatment After Plaintiff's Disability Onset Date (November 26, 2013)

On November 29, 2013, three days after Plaintiff's alleged onset date, Dr. Baker conducted a mental health clinic intake exam on Plaintiff. (Id. at 397.) Plaintiff's chief complaint was that he was sent home from work because they said he was "unfit for duty." (Id.) He also complained of feeling angry and irritable, both at work and at home. (Id. at 398.) Plaintiff also reported feeling guilty, disconnected, worthless, and having nightmares. (Id.) The doctor noted that Plaintiff was

well-groomed, cooperative, and friendly, and had normal speech and a linear, logical thought process. (Id.) However, he also noted that Plaintiff was distraught, anxious, and depressed. (Id.) Dr. Baker's diagnostic impression was PTSD with co-occurring symptoms of major depression, without psychosis or suicidal ideation. (Id. at 400.)

On January 24, 2014, Plaintiff was seen for a follow up appointment by Dr. Yocum, a clinical psychologist. (Id. at 387.) Dr. Yocum assessed Plaintiff and found, among other things, that Plaintiff had difficulty with attention, concentration, and employment. (Id. at 395.) In assessing Plaintiff, Dr. Yocum utilized the PTSD Diagnostic Criteria from the Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[2] (Id. at 383.) After marking the indicator under each Criterion that were attributable, the doctor diagnosed Plaintiff with PTSD. (Id. at 383.)

Dr. Yocum next assessed Plaintiff's mental status. (Id. at 385.) The doctor noted that Plaintiff was neatly and casually

---

[2] The DSM-5 is "the handbook used by healthcare professionals in the United States and much of the world as the authoritative guide to the diagnosis of mental disorders. DSM contains descriptions, symptoms, and other criteria for diagnosing medical disorders." DSM-5 Frequently Asked Questions, AMERICAN PSYCHIATRIC ASSOCIATION, https://www.psychiatry.org/psychiatrists/practice/dsm/feedback-and-questions/frequently-asked-questions (last visited Oct. 11, 2017).

dressed, well-groomed, and oriented to person, place, and thing. (Id.) The doctor further opined that Plaintiff's thought process was logical and goal-directed, appropriate, and there was no evidence of hallucinations. (Id. at 386.) However, the doctor also noted that Plaintiff's mood was depressed, his judgement was impaired, and he had suicidal ideation without a plan or intent. (Id.)

In addition to his PTSD diagnosis, Dr. Yocum remarked that Plaintiff met the diagnostic criterion for Major Depressive Disorder, which is secondary to his PTSD. (Id. at 386.) The doctor also noted that Plaintiff's symptoms had slightly worsened since his evaluation by Dr. Baker on December 27, 2013. (Id. at 386.) Under "Current Diagnosis," Dr. Yocum stated that "Veteran is diagnosed with PTSD and depression. These diagnoses result in symptoms that are active and independent. All symptoms work in conjunction to impact social and occupational functioning. It is impossible to fully differentiae what portion of impairments are attributable to each diagnosis." (Id. at 389.) In regard to Plaintiff's unemployment, Dr. Yocum stated:

> Veteran's irritability and outbursts of anger alienates others. His panic abruptly removes him from others and causes him to withdraw and avoid social interactions. His feeling "on guard" with others can impede his ability to form good working relationships. The overall effects of these symptoms are impairments in his ability to work cooperatively with peers, management and with the public.

(Id. at 395.) In regard to Plaintiff's attention and
concentration, Dr. Yocum stated:

> Veteran has many symptoms that interfere with attention,
> concentration, memory and problem-solving. He has intense
> internal and external cues which cause his psychological
> distress. His hypervigilance and his flashbacks all impede
> his attention and concentrations. These symptoms impair his
> ability to understand and follow instructions, retain
> instructions, and communicate effectively.

(Id.) Finally, in regard to motivation and drive, Dr. Yocum
wrote "[Plaintiff's] flashbacks and lack of energy impair [his]
ability to maintain task persistence, to arrive at work on time,
and to work a regular schedule without excessive absences to a
severe extent." (Id.)

On March 20, 2015,[3] Plaintiff was examined by Dr. Guttin.
(Id. at 481.) Plaintiff informed the doctor that he had not
worked in fifteen months and had not been leaving the house.
(Id.) Despite his lack of work and his poor sleep quality,
Plaintiff did note that his wife was a good support for him and
their relationship was doing well. (Id.) The nursing note for
the visit stated that Plaintiff took a PHQ-2 and screened
positive for depression. (Id. at 484.) The note also indicated
that Plaintiff took little interest or pleasure in doing things
and felt down, depressed, or hopeless nearly every day. (Id.)

---

[3] Plaintiff received no medical or mental health treatment from
January 2014 to March 2015.

Five days later, on Match 25, 2015, Plaintiff was seen by a licensed clinical social worker, Ms. Sarsingh. (Id. at 475.) During the examination Plaintiff was administered assessments. (Id.) The first assessment, a PHQ-9 for Patient Health, resulted in a score of 24, which indicates severe depressive symptoms, including, but not limited to, hopelessness, low energy, and trouble concentrating. (Id. at 476.) The second assessment, a GAD-7 for Generalized Anxiety Disorder, resulted in a score of 21, which indicates severe symptoms of anxiety. (Id. at 478.) Finally, a PCL-F assessment to measure PTSD symptoms was conducted and Plaintiff scored 58/80. (Id. at 477.)

On April 27, 2015, Dr. Baye examined Plaintiff. (Id. at 469.) Plaintiff explained that he was feeling overwhelmed and having anger management issues. (Id. at 470.) Plaintiff described an incident with his neighbor where the neighbor banged on the floor while Plaintiff was walking across it causing Plaintiff to bang on her apartment door and scream at her. (Id.) Dr. Baye noted Plaintiff's mood to be "depressed and stressed out," but also noted that his thought process was linear, goal directed, and future oriented. (Id. at 470.) The doctor assed plaintiff with PTSD and insomnia. (Id.)

On April 29, 2015, Dr. Nola, a clinical psychologist and one of Plaintiff's treating physicians at the VA, conducted a mental health examination. (Id. at 461.) According to the

medical records, Plaintiff's "symptoms were addressed and his diagnosis was reported utilizing the DSM-5." (Id. at 469.) Dr. Nola diagnosed Plaintiff with PTSD and Major Depressive Disorder recurrent with anxious distress (secondary to PTSD.) (Id.) The doctor reported that the following symptoms actively applied to Plaintiff's diagnosis: depressed mood, anxiety, suspiciousness, panic attacks that occur weekly or less often, chronic sleep impairment, mild memory loss, such as forgetting names, directions or recent events, flattened affect, disturbances of motivation and mood, difficulty in establishing and maintaining effective work and social relationships, difficulty in adapting to stressful circumstances, including work or a work-like setting, and impaired impulse control, such as unprovoked irritability with periods of violence. (Id. at 467.)

Dr. Nola also noted behavioral observations for Plaintiff being "oriented times four," able to maintain good eye contact, and having clear and goal directed thought processes. (Id.) However, in regard to employment, considering Plaintiff's mental health condition, the doctor wrote "it is this writer's clinical opinion that [Plaintiff's] symptoms impair his ability to focus, concentrate and be able to work collaborative[ly] with others. His symptoms severely impair his ability to cope with stress, tolerate disagreements, and he is prone to becoming overwhelmed easily. His anxiety impacts his motivation and [] would result

in him missing significant time from work. He has difficulties with being able to complete his work on time and deadline[s] would only worsen his ability to engage in work assignments." (Id. at 469.) In the end, Dr. Nola noted that Plaintiff's impairments would affect both sedentary and physical employment. (Id.)

### 3.   State Agency Consultants

On April 21, 2014, Dr. Warren, a state agency psychologist, reviewed Plaintiff's medical records and found that he had an affective disorder and an anxiety disorder. (Id. at 112.) The doctor explained that those impairments would cause a mild restriction in activities of daily living, moderate difficulties in maintaining social function, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decomposition. (Id.)

On June 2, 2015, during Plaintiff's hearing in front of the ALJ, the ALJ heard testimony from a Vocational Expert ("VE"). (Id. at 92.) The ALJ asked the VE if there was any work in the national economy for Plaintiff given the following parameters.

First, the ALJ asked the VE to take into account Plaintiff's age, education, and past jobs; assume he is limited to light work as defined under the DOT but cannot climb ropes, ladders or scaffold; assume he cannot perform more than occasional overhead lifting and reaching, and requires low

stress (routine work that does not involve a fast production rate pace, or strict production quotas); assume he can understand remember and carry out simple instructions consistent with unskilled work; and assume Plaintiff can have no interaction with the public and no more than occasional interaction with coworkers and supervisors. (Id. at 92–93.) Given these parameters, the VE found that Plaintiff could be a night cleaner (light exertional level) with national job numbers of 878,000, an inserting machine operation (light exertional level) with national job numbers of 115,000, or a checker (light exertional level) with national job numbers of 68,000. (Id. at 93.)

Next, the ALJ asked the VE to assume the same facts as above, but to also limit Plaintiff to sedentary work. (Id. at 93–94.) The VE responded that Plaintiff could be a document preparer, which has 38,000 national jobs, an addresser with 96,000 jobs, or a semi-conductor monitor with 20,000 jobs. (Id. at 94.)

Finally, the ALJ asked the VE to assume the same facts as above, but Plaintiff is off task 10% of the time, and then assume 11-15% of the time. (Id. at 95.) The VE responded that Plaintiff could be off task 10% of the time but if he is off task more than 10% he could not perform any jobs in the national economy. (Id.)

**C.    ALJ Decision**

In a written decision dated November 4, 2015, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act from November 26, 2013, through the date of her decision. (Id. at 21.)

Using the five-step sequential evaluation process, the ALJ determined at step one that Plaintiff had not engaged in any substantial gainful activity since November 26, 2013, the alleged onset date of disability. (Id. at 23.)

At step two, the ALJ determined that Plaintiff had severe impairments of post-traumatic stress disorder, major depressive disorder, tinnitus, and gunshot wound to the right upper extremity muscle. (Id. at 24.)

Next, at step three, the ALJ did not find that Plaintiff's impairments met the severity of one of the impairments listed in Appendix 1. (Id.) Specifically, in considering whether Plaintiff's impairments reached the level of severity of a listed Affective Disorder, 12.04, or an Anxiety-Related Disorder, 12.06, the ALJ explained that the impairments did not meet the "paragraph B" criteria because they were not marked limitation (more than moderate but less than severe) nor repeated episodes of decomposition (three episodes within 1 year). (Id. at 25.) The ALJ supported her findings by relying on Plaintiff's ability to attend school, take care of his children,

attend church, go to the grocery store, and cook meals. (Id.)
The ALJ noted generally that the medical evidence supported her
finding and that no treating physician mentioned findings
equivalent in severity to criteria of the listed impairments.
(Id. at 26.) Finally, the ALJ mentioned that she considered the
opinion of the state agency medical consultant who reached the
same determination as the ALJ. (Id.)

For steps three and four the ALJ needed to determine
Plaintiff's Residual Functional Capacity ("RFC"). The ALJ found
that Plaintiff had the RFC to perform a full range of light work
except that he could not climb ropes, ladders, or scaffold, he
could only occasionally perform overload lifting and reaching,
he would require low stress work, he could understand, remember,
and carry out simple tasks consistent with unskilled work, he
could have no interaction with the public, and only occasional
interaction with coworkers and supervisors, and finally, he
would be off task 5% of the workday in addition to normal
breaks. (Id. at 27.)

Based on Plaintiff's RFC and testimony from a vocational
expert, the ALJ found, at step four, that Plaintiff was unable
to perform any past relevant work. (Id. at 37.) However, at step
five, the ALJ found that there exists a significant number of
jobs in the national economy that Plaintiff can perform. (Id. at
38.)

## III. STANDARD OF REVIEW

The Court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008). The requirement of substantial evidence, however, constitutes a deferential standard of review, see Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004), and does not require "a large or [even] considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 564 (1988). Rather, substantial evidence requires "more than a mere scintilla[,]" Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), but generally less than a preponderance. See Jones, 364 F.3d at 503. Consequently, substantial evidence supports the Commissioner's determination where a "reasonable mind might accept the relevant evidence as adequate" to support the conclusion reached by the Commissioner. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

The ALJ must set out a specific factual basis for each finding. See Baerga v. Richardson, 500 F.2d 309 (3d Cir. 1974), cert. denied, 420 U.S. 931 (1975). Additionally, the ALJ "must adequately explain in the record [the] reasons for rejecting or

discrediting competent evidence," Ogden v. Bowen, 677 F. Supp.

273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d

581 (3d Cir. 1986)), and must review all pertinent medical and

nonmedical evidence "and explain his conciliations and

rejections," Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d

112, 122 (3d Cir. 2000.) However, the ALJ need not discuss

"every tidbit of evidence included in the record." Hur v.

Barnhart, 94 F. App'x 130, 133 (3d Cir. 2004). Rather, the ALJ

must set forth sufficient findings to satisfy the reviewing

court that the ALJ arrived at a decision through application of

the proper legal standards, and upon a complete review of the

relevant factual record. See Friedberg v. Schweiker, 721 F.2d

445, 447 (3d Cir. 1983).

IV. **DISCUSSION**

A. **Legal Standard for Determination of Disability**

To be eligible for Social Security disability insurance

benefits, a claimant must have a "medically determinable

physical or mental impairment" that prevents him from engaging

in any "substantial gainful activity" for a continuous twelve-

month period. 42 U.S.C. § 1382c(a)(3)(A); Plummer, 186 F.3d at

427. A claimant lacks the ability to engage in any substantial

gainful activity "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education,

and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B); Plummer, 186 F.3d at 427–28.

The Commissioner reviews disability claims in accordance with a five-step process set forth in 20 C.F.R. § 404.1520. In step one, the Commissioner must determine whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 1520(b). If the answer is yes, the disability claim will be denied. See Bowen v. Yuckert, 482 U.S. 137, 140 (1987). In step two, the Commissioner must determine whether the claimant is suffering from a "severe impairment," defined as an impairment "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 1520(c). A claimant who cannot claim a "severe" impairment is ineligible for benefits. Plummer, 186 F.3d at 428.

Step three requires the Commissioner to compare the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful activity. 20 C.F.R. § 1520(d). If a claimant suffers from a listed impairment or its equivalent, he is approved for disability benefits and the analysis stops. If he does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five to determine whether he retains the ability to

engage in substantial gainful activity. Plummer, 186 F.3d at
428.

The Commissioner conducts a residual functional capacity
("RFC") assessment at steps four and five. The RFC assessment
considers all of the claimant's medically determinable
impairments and determines the most the claimant can still do
despite his limitations. 20 C.F.R. § 404.1545(a)(1)-(2). The RFC
is expressed in terms of physical exertional levels of
sedentary, light, medium, heavy, or very heavy work. 20 C.F.R. §
416.967 (2002). Based on the claimant's RFC, the Commissioner
determines, at step four, whether the claimant can perform the
physical exertion requirements of his past relevant work. 20
C.F.R. § 404.1520(f). If he is unable to resume his former
occupation, the Commissioner will then proceed to the final step
and decide whether the claimant is capable of performing other
work existing in significant numbers in the national economy,
taking into account his RFC and vocational factors such as age,
education, and work experience. 20 C.F.R. §§ 404.1520(g),
404.1560(c).

In the final step, step five, the ALJ relies on the
Medical-Vocational Guidelines ("Guidelines" or "Grids") set
forth in 20 C.F.R. Part 404, Subpart P, Appendix 2, which
establish the types and number of jobs that exist in the
national economy for claimants with certain exertional

impairments. The Guidelines "consist of a matrix of four factors
– physical ability, age, education, and work experience – and
set forth rules that identify whether jobs requiring specific
combinations of these factors exist in significant numbers in
the national economy." Sykes v. Apfel, 228 F.3d 259, 273 (3d
Cir. 2000). If no jobs exist given Plaintiff's RFC, he will be
found disabled.

### B. Weight the ALJ assigned to Plaintiff's Treating Physicians and VA

Plaintiff argues that the ALJ erred in determining his RFC
because the ALJ did not give enough weight to Plaintiff's
treating physicians and the disability determination by the VA.
(Pl. Br. at 31–39.)

SSR 96-8p dictates that the RFC assessment is a "function-
by-function assessment based upon all of the relevant evidence
of an individual's ability to do work-related activities." SSR
96-8p.  In order to meet the requirements of SSR 96-8p, the ALJ
"must specify the evidence that he relied upon to support his
conclusion." Sullivan v. Comm'r of Soc. Sec., No. 12-7668, 2013
WL 5973799, at *8 (D.N.J. Nov. 8, 2013). Moreover, the ALJ's
finding of residual functional capacity must be "accompanied by
a clear and satisfactory explanation of the basis on which it
rests." Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2011)
(quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 2011)).

1.  Treating physicians

It is well established that "the ALJ - not treating or
examining physicians or State agency consultants - must make the
ultimate disability and RFC determinations." Chandler v. Comm'r
of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011) (citing 20 C.F.R.
§§ 404.1527(e)(1), 404.1546(c).)[4] Furthermore, while an ALJ must
consider the opinions of treating physicians, "[t]he law is
clear . . . that the opinion of a treating physician does not
bind the ALJ on the issue of functional capacity" where it is
not well supported or there is contradictory evidence. Chandler,
667 F.3d at 361 (alteration in original) (quoting Brown v.
Astrue, 649 F.3d 193, 197 n.2 (3d Cir. 2011)); see also Coleman
v. Comm'r. of Soc. Sec. Admin., 494 F. App'x 252, 254 (3d Cir.
2012) ("Where, as here, the opinion of a treating physician
conflicts with that of a non-treating, non-examining physician,
the ALJ may choose whom to credit but cannot reject evidence for
no reason or for the wrong reason.") (quoting Morales v. Apfel,
225 F.3d 310, 317 (3d Cir. 2000)). On the other hand, treating
physicians' reports "should be accorded great weight, especially
'when their opinions reflect expert judgment based on a
continuing observation of the patient's condition over a
prolonged period of time.'" Plummer, 186 F.3d at 429.

---

[4] "A claimant's RFC is 'the most [he] can still do despite [his]
limitations.'" 20 C.F.R. § 416.945(a)(1).

When a conflict in the evidence exists, the ALJ retains significant discretion in deciding whom to credit. Id. The ALJ is entitled to weigh all evidence in making its finding, and is not required to accept the opinion of any medical expert. Brown v. Astrue, 649 F.3d 193, 196 (3d Cir. 2011.) For an ALJ to assign a treating physician "little weight", however, the ALJ must point to other medical evidence in the record that contradicts the physician, Coleman v. Comm'r. of Soc. Sec. Admin., 494 F. App'x 252, 254 (3d Cir. 2012.) and give a clear explanation for why she is discounting the medical evidence. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999); Cotter v. Harris, 642 F.2d 700, 704-05 (3d Cir. 1981).

Thus, if a treating source's medical opinion on the issue of the nature and severity of Plaintiff's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record, it will be given controlling weight. 20 C.F.R. § 404.1527(c)(2). Diagnostic techniques include psychological tests. Revisions to Rules Regarding Evaluation of Medical Evidence, 82 FR 5844-01.

However, pursuant to SSR 96-2p, if the ALJ finds that the treating source's opinion is not well-supported, that "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source medical

opinions are still entitled to deference and must be weighed using all the factors provided in 20 CFR 404.1527 and 416.927." These factors include the examining relationship, the treatment relationship (the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship), supportability, consistency, and specialization. See 20 C.F.R. § 404.1527(c)(1)-(5).

### a. The ALJ erred in assigning little weight to Plaintiff's treating physician, Dr. Yocum

Plaintiff claims that the ALJ mistakenly assigned little weight to Dr. Yocum's medical opinion. (Pl. Br. at 32.) Specifically, Plaintiff argues that when assigning little weight to Dr. Yocum's opinion, the ALJ (1) erred in supporting her assignment of weight upon the reasoning that Dr. Yocum failed to provide clinical evidence to support the doctor's medical opinion and instead the ALJ's opinion appeared to be based solely on Plaintiff's subjective complaints, and (2) failed to specifically point to other medical evidence in the record that supports the assignment of little weight. (Pl. Br. at 33–34.)

### i. The ALJ failed to consider Dr. Yocum's diagnostic technique when determining that the doctor did not provide clinical evidence to support her medial opinion

In her opinion, the ALJ acknowledged that Dr. Yocum's medical opinion was suggestive of Plaintiff having "an inability to perform several basic work-related activities on a sustained

basis." (R. at 31.) However, the ALJ decided to afford Dr.

Yocum's opinion little weight because she believed the doctor

failed to provide any clinical evidence to support the doctor's

medical opinion, and instead based the opinion solely on

Plaintiff's subjective complaints. (Id.)

The ALJ states that Dr. Yocum failed to provide clinical

evidence, but the regulation requires that a treating

physician's medical opinion must be supported by "medically

acceptable clinical and laboratory diagnostic techniques," not

necessarily clinical "evidence." 20 C.F.R. § 404.1527(c)(2). The

record reflects that in assessing Plaintiff, Dr. Yocum, a

clinical psychologist, utilized the PTSD Diagnostic Criteria

from the DSM-5. (R. at 383.) The DSM-5 is the authoritative

guide for healthcare professionals in diagnosing mental

disorders. See supra note 2. Thus, since the DSM-5 is one of the

most commonly used diagnostic techniques for mental disorders,

and Dr. Yocum utilized the DSM-5 in diagnosing Plaintiff, the

ALJ erred when she concluded that Dr. Yocum did not provide

evidence to support the doctor's medical diagnosis and opinion.

Dr. Yocum applied the medically acceptable clinical technique of

utilizing the DSM-5 criterion in evaluating Plaintiff's medical

condition.

> ii. The ALJ did not sufficiently show that Dr.
> Yocum's opinion was inconsistent with other
> substantial evidence in the record

In her opinion, the ALJ gave one sentence describing what she felt was evidence that contradicted Dr. Yocum's opinion. (R. at. 31.) The ALJ explained that the opinion was "contrary to the claimant's demonstrated ability of attending college on a full-time basis for the Fall of 2013 and Spring of 2014, and achieving successful results, including making the Dean's Listings in the Spring of 2014." (Id.) The ALJ did not point to any medical evidence to contradict Dr. Yocum. (Id.) The Commissioner argues that if the ALJ's record is read as a whole, the ALJ used Dr. Baker's observation of Plaintiff's linear thought process and Dr. Nola's observation that Plaintiff was goal oriented and had a clear thought process to contradict Dr. Yocum's opinion. (Def. Br. at 17-18.) This Court disagrees. It is well established that when an ALJ discounts evidence the judge must "give a clear explanation" for that decision. Plummer, 186 F.3d at 429. The opinion is not clear that the ALJ wanted to use Dr. Baker and Dr. Nola's findings, that the ALJ did mention in determining Plaintiff's RFC, to discount Dr. Yocum's opinion. This Court asks the ALJ to re-evaluate her discounting of Dr. Yocum's medical opinion.

### b.    The ALJ erred in assigning little weight to Plaintiff's treating physician, Dr. Nola

In her opinion, the ALJ gave a much more in-depth analysis for assigning little weight to Dr. Nola than she did for Dr.

Yocum. (R. at 34.) The ALJ again reasoned that Dr. Nola's opinion was based on claimant's subjective complaints and not supported by preponderance of the record. (Id.)

> i. The ALJ failed to consider Dr. Nola's diagnostic technique when determining that the doctor's opinion was based on Plaintiff's subjective complaints

In addition to finding that Dr. Nola's opinion was based on only Plaintiff's subjective complaints, the ALJ took issue with the fact that Dr. Nola did not conduct a mental status exam on Plaintiff's "concentration, persistence, and pace." (Id. at 34.)

Though Dr. Nola did not conduct a mental status exam he did, similar to Dr. Yocum, utilize the DSM-5 in diagnosing Plaintiff and coming to the conclusion that Plaintiff's impairments would affect both sedentary and physical employment. (Id. at 469.) Therefore, this court finds again that since the DSM-5 is one of the most commonly used diagnostic techniques for mental disorders, and Dr. Nola utilized the DSM-5 in diagnosing Plaintiff, the ALJ erred when she concluded that Dr. Nola's opinion was based solely on Plaintiff's subjective complaints.

> ii. The ALJ did not sufficiently show that Dr. Nola's opinion was contrary to other medical evidence in the record

In holding that Dr. Nola's medical findings were not supported "by the preponderance of the record" the ALJ only pointed to Dr. Baye's mental health outpatient note as evidence

of contradictory medical evidence. (Id. at 34.) In his notes, Dr. Baye found Plaintiff's mood to be "depressed and stressed out," but also noticed that Plaintiff's thought process was "linear, goal directed, and future oriented;" and assessed Plaintiff with PTSD and insomnia. (Id. at 470.) The ALJ lists no other medical evidence that contradicts Dr. Nola. (Id. at 34.)

In explaining his conclusion that Plaintiff's impairments would affect employment, Dr. Nola stated that Plaintiff's symptoms impair his ability to focus, concentrate, and work collaboratively with others, and that Plaintiff's symptoms severely impair his ability to cope with stress and tolerate disagreements, and that he is prone to becoming overwhelmed easily. (Id. at 469.) He further found that Plaintiff's anxiety impacts his motivation and would result in his missing of significant time from work. (Id.) Finally, Dr. Nola explained that Plaintiff would have difficulties in completing his work on time and deadlines would only worsen his ability to engage in work assignments. (Id.) It was for all these reasons that Dr. Nola found Plaintiff's employment to be limited.

Dr. Nola found Plaintiff's employment limited by his impairments. Because it appears the ALJ may have overlooked significant aspects of Dr. Nola's findings, this Court asks the ALJ to re-evaluate the weight she assigns to Dr. Nola's medical opinion.

2.  The ALJ did not error in assigning little weight to
    the VA's determination that Plaintiff was disabled

In her opinion, the ALJ gave little weight to the VA's finding that Plaintiff is disabled. (Id. at 36.) The ALJ explained that the ultimate issue of disability is a medical/vocational determination reserved for the Social Security Commissioner. (Id.) Furthermore, the ALJ reasoned that the VA's standards for determining disability were substantially different than the SSA. (Id.) The ALJ gave the example that the VA does not address an individual's ability to perform alternate forms of employment, so they would find Plaintiff disabled even when the SSR determines that Plaintiff's RFC makes him eligible for a wide range of light work. (Id.)

Plaintiff argues that the ALJ did not identify any medical evidence to contradict the fact that Plaintiff was found disabled by the VA, and, thus, the VA's disability determination should be entitled to greater weight because it was supported by substantial evidence in the record. (Pl. Br. at 39-40.)

Decisions by other governmental or nongovernmental agencies of a claimant's disability are not binding on the ALJ. 20 C.F.R. §§ 404.1504. However, even if the ALJ disagrees with the agency's decision the ALJ must consider the decision. SSR 06-3p. The ALJ is not required to present conflicting medical evidence to an agency decision, she is simply required to "consider" the

agency's decision. (Id.) "Consider" is defined as providing an explanation sufficient for a subsequent reviewer to follow the ALJ's reasoning. (Id.)

In this case, the ALJ did explain why she gave the VA's determination little weight. The ALJ explained that the standard for determining disability at the VA is different than the standard at the SSR. (R. at 36.) The ALJ gave the example that at the VA the Complainant does not need to be totally disabled to be classified as disabled, where for the SSR Plaintiff needs to be fully disabled. (Id.) Thus, the ALJ properly "considered" the VA's finding that Plaintiff is disabled and was within her authority to assign the VA's finding little weight.

### C.   The ALJ Needs to Reconsider Plaintiff's Mental Impairments

Plaintiff argues that the ALJ committed reversible error at Step 3 of the five-step process by improperly relying solely on Plaintiff's subjective statements and testimony to reach her finding that Plaintiff's mental impairments do not meet and/or equal the Listings 12.04 and 12.06. (Pl. Br. at 22.)

As discussed above, if the ALJ determined that Plaintiff's mental impairments equaled one of the 12.00 listings then she would have found Plaintiff to be disabled. 20 C.F.R. § 404.1520(d). At issue in this case are Listing 12.04 (depressive, bipolar, and related disorders) and Listing 12.06

(anxiety and obsessive-compulsive disorders). 20 C.F.R. § 404, Subpt. P, App.1. Plaintiff bears the burden of establishing entitlement to disability. 20 C.F.R. 404.1512(a). In order for Plaintiff to show that he meets one of the listed impairments under Section 12.00, and thus is entitled to disability, he must prove all of the elements of the listing he is claiming. Sullivan v. Zebley, 493 U.S. 521, 530 (1990). To prove that he meets listings 12.04 and 12.06, Plaintiff must show that the severity of his impairments either meets or is medically equivalent to either the "A" criteria and "B" criteria, or the "A" criteria and "C" criteria. 20 C.F.R. § 404, Subpt. P, App. 1 (hereinafter "Listings"). The ALJ found that Plaintiff met the "A" criteria for both listings, but not those for "B" or "C". (R. at 25-26.) Plaintiff does not contest that he does not meet the "C" criteria, but argues that the ALJ erred in not finding that he meets the "B" criteria. (Pl. Br. at 22-30.)

The "B" criteria are identical for 12.04 and 12.06. Listings. There are four "areas of mental functioning" listed under "B." (Id.)[5] They are: 1) understand, remember, or apply information;[6] 2) interact with others;[7] 3) concentrate, persist,

---

[5] The name of the four areas of mental functioning listed in the regulation under "B" criteria changed between the time the ALJ wrote her opinion and the time this opinion is being written.
[6] Replaced, "repeated episodes of decomposition."
[7] Formally, "maintain social functioning."

or maintain pace;[8] and 4) adapt or manage oneself.[9] (Id.) To satisfy the "B" criteria, Plaintiff must show that he has extreme limitation in one of the four areas given, or marked limitations in two of the areas. (Id.) Plaintiff has an extreme limitation if he is "not able to function in this area" on a sustained basis, and a marked limitation if his functioning in this area is "seriously limited." (Id.)

The ALJ did not find Plaintiff's impairments to meet the severity of the impairments listed in Appendix 1. (Id. at 24.) The ALJ supported her finding by relying on Plaintiff's ability to attend school, take care of his children, attend church, go to the grocery store, and cook meals. (Id. at 25.) The ALJ noted that no treating physician mentioned findings equivalent in severity to the criteria of the listed impairments. (Id. at 26.)

This Court disagrees. Plaintiff's treating physicians, Dr. Yocum and Dr. Nola, both recorded impairments of Plaintiff that possibly reached the severity of the listed impairments. See id. at 387–95, 461–69. However, since the ALJ improperly assigned "little weight" to both treating physicians, their opinions were not correctly considered. This court requires that after the ALJ re-determine the weight that should be assigned to Plaintiff's treating physicians, the ALJ go back to step 3 and re-determine

---

[8] Did not change.
[9] Formally, "activities of daily living."

if Plaintiff's medical impairments meet Listing 12.04 or Listing 12.06 in Appendix 1, and proceed accordingly.

## V. CONCLUSION

For the reasons stated above, this Court will vacate the ALJ's decision and remand the case for further consideration in light of this decision. The accompanying Order is entered.


**October 25, 2017**                    **s/ Jerome B. Simandle**
Date                                    JEROME B. SIMANDLE
                                        U.S. District Judge